J. Irwin Shapiro, J.
The trial of this action by the beneficiary to recover upon two policies of life insurance, totaling $5,000, resulted in a disagreement by the jury. At the end of the trial, the court reserved decision on the defendant’s motion to dismiss the complaint and for a directed verdict in its favor. After the jury was discharged, the foregoing motions were renewed and the defendant also moved, pursuant to section 457-a of the Civil Practice Act, for judgment in its favor notwithstanding the disagreement of the jury. Again the court reserved decision.
This is the second time, that a trial of this action has resulted in a jury’s disagreement. The Justice presiding at the first trial denied the defendant’s motion for judgment, pursuant to section 457-a of the Civil Practice Act, notwithstanding the jury’s failure to agree on a verdict, and the order entered thereon was unanimously affirmed by the Appellate Term (N. Y. L. J., May 3, 1957, p. 8, col. 4). The record in this trial, however, is materially different from that in the first tria] since the test] *1025 mony of three physicians with respect to the diagnosis and treatment of the deceased’s ailment was admitted upon this trial, whereas, under the provisions of section 352 of the Civil Practice Act, it was excluded from the first trial. Consequently, the affirmance of the order denying judgment notwithstanding the jury’s disagreement on the first trial is not conclusive in the determination of the similar motion which the court must now decide in connection with the second trial.
One of the two policies sued upon is for $2,000 and the other for $3,000. Both were issued on the life of plaintiff’s husband on December 10, 1954. In Part I of the application, dated November 25, 1954, the following appears above the signature of the deceased: “It is hereby agreed that any policy issued hereon shall not take effect until the first premium thereunder has been paid during my good health; that no agent or other person except the President, a Vice-President, the Secretary, the Treasurer, a Registrar or an Assistant Registrar of the Society has power to make or modify any contract on behalf of the Society or to waive any of the Society’s rights or requirements, and that no waiver shall be valid unless in writing and signed by one of the foregoing officers. All of the foregoing statements and all those contained in Part II hereof are true, full and complete, and are offered to the Society as an inducement to issue the policy or policies for which application is hereby made. ’ ’
Part II of the application, dated December 1, 1954, contains, in part, the following statements and representations of the deceased in response to specific questions contained therein:
“ 6 (c). Have you ever had or been treated for any disease or disorder of the heart, blood vessels or blood? (Ans.) No.
“ 6 (d). Have you ever had or been treated for any disease or disorder of the stomach, liver, intestines, kidney or bladder? (Ans.) No.
“ 7 (b). Have you ever consulted a physician about a pain in the chest or shortness of breath? (Ans.) No.
“ 7 (f). Have you ever been in a sanatorium, hospital, asylum or other institution for observation, diagnosis, treatment or operation? (State where.) (Ans.) Yes. Appendectomy— 1929 — 2 wks. — O. K.
“7(g). Have you ever had any other illness or injury? (Ans.) No.
“8(a). Have you ever had an electrocardiogram made? (Ans.) No.
*1026 “8(b). Have you ever had an x-ray examination made? (Ans.) No.
“ 9. Have you consulted or been treated by any physician, practitioner or specialist during the past five years? (If ‘ Yes, ’ state details of each such consultation or treatment below.) (Ans.) No. ”
Above the signature of the decedent on said Part II of the application, appears the following: “ I have read the foregoing answers which are true, full and complete, and agree that such answers shall be part of the application, which shall consist of both Part I and Part II, and that such answers shall also become part of any policy contract that may be issued on the strength thereof.”
The insured died on February 3,1955 and the proofs of death submitted by the plaintiff to the defendant stated that the cause of death was coronary occlusion due to an operation for carcinoma of the cecum. The attending physician’s statement submitted as part of said proofs of death states that the physician had first attended the patient in the last illness on “ January 13” and that he had advised or treated the patient in 1952 for diverticulosis of the colon.
On April 20, 1955, the defendant elected to rescind the two policies in question and tendered back the sum of $182.45 representing the premiums that had been paid thereon. Plaintiff thereupon brought this action. The first cause of action is for the face amount of the $2,000 policy and the second for the face amount of the $3,000 policy. In its answer, the defendant asserted two defenses. The first was based upon the rescission of the two policies on the ground of material misrepresentations contained in the application for the issuance thereof, and the second that these policies never had any legal inception because the condition precedent of payment of the first premium during the good health of the applicant had not been fulfilled.
The court submitted the case to the jury solely on the basis of the first defense and ruled out the second defense as a matter of law because there was no proof that any substantial change in the condition of the health of the applicant for insurance had occurred “ between the date of the application and the payment of the first premium.” (Eastern Dist. Piece Dye Works v. Travelers Ins. Co., 198 App. Div. 610, 616, affd. 234 N. Y. 441; Bronx Sav. Bank v. Weigandt, 1 N Y 2d 545, affg. 286 App. Div. 748, affg. 207 Misc. 820.)
It was stipulated upon the record that a physician chosen by the defendant prior to the issuance of the policies in suit made *1027 a complete and thorough physical examination of the insured and asked him the questions which appear upon the application, to which the insured made the corresponding answers appearing thereon. It was also stipulated that the application, initially, was for only $2,000 insurance, but that after the physical examination had taken place, the agent who had procured the original application told the insured that he had passed that examination and suggested that he either increase his application or obtain an additional policy. The agent then sold the insured the $3,000 policy in suit and stated at that time that he would like to sell him additional insurance.
After the plaintiff rested her case, the defendant called to the witness stand three physicians who had treated the insured prior to the time that he applied for the insurance represented by the policies in suit. One of these physicians, Dr. Abelson, was consulted for the first time on December 20, 1950 for a sudden onset of pain in the insured’s chest. Dr. Abelson examined the patient at his home and took an electrocardiogram. He stated that he found auricular fibrillation and diagnosed it as a possible myocardial infarction. A cardiologist, Dr. Candel, was consulted that very day. He examined the patient and took electrocardiograms at his bedside. He saw him again on February 3, March 13 and August 9, 1951, on each of which occasions he took electrocardiograms. Dr. Candel’s diagnosis was myocardial infarction due to arteriosclerotic heart disease and this diagnosis remained throughout his treatment. Dr. Abelson testified that he saw the patient some 16 times between December 20,1950 and April 15,1951 and took four electrocardiograms during that period. He advised the patient to stay home during the whole time because of his heart’s condition and prescribed for him.
Dr. Davis examined the insured on January 23, 1954, when he took an electrocardiogram and made a diagnosis of coronary artery disease. He advised bedrest and continued observation and prescribed coronary dilators, sedatives and analgesics for the pain involved. He saw the patient six times thereafter, on April 13, May 1, July 16 and October 18, and on December 29, 1954 and January 18,1955. He stated that his original diagnosis remained essentially the same throughout; that he took a cardiogram only on the occasion of his first visit and interpreted it as showing “ auricular fibrillation, left ventricular strain and hypertrophy and coronary insufficiency ’ ’ which was due to coronary sclerosis.
Dr. Smith, who is the defendant’s associate medical director, testified that under the rules of the company the application for *1028 insurance would have been declined had the foregoing facts been brought to the attention of the defendant. On cross-examination, however, it was brought out that the defendant had issued to the insured a policy of life insurance, dated December 16, 1952, for $2,000 to which was attached the insured’s application, dated October 30, 1952, containing substantially the same questions which appear upon the application attached to the policies in suit. With respect to questions 8 (a), (b) and 9, the insured gave the following answers in that application:
“8(a). Have you ever had an electrocardiogram, X-ray or fluroscopic examination made? (Ans.) Yes 6 mos. ago. Dr. Weiss, N. Y. O. check-up good.
“8(b). Have you ever had your blood examined? (Ans.) Yes 6 mos. ago. Dr. Weiss, N. Y. C. check-up good.
“ 9. Have you consulted or been treated by any physician, practitioner or specialist during the past five years? (Ans.) Dr. Weiss. Check up 1952 good Central Pk West. No complaints N. Y. C.”
Dr. Smith was asked by plaintiff’s attorney:
“ Q. Doctor, it is a fact, is it not, that the Equitable Life Assurance Society knew of the fact that Barney Ettman had been examined by a physician in 1952; that he had been in the Polyclinic Hospital and that he had electrocardiograms taken and that he had a blood count done in 1952 and that the company issued a policy known as Policy No.-
‘ ‘ The Court : Issued a policy which you have in your hand.
The Witness: Yes, we knew of that application and policy.
By Mr. Zipser:
Q. And you issued the policy? A. Yes, we did.”
Dr. Smith stated that knowledge on the part of the defendant merely that an electrocardiogram of an applicant for insurance had been taken does not necessarily cause the company to call for the electrocardiogram. If the electrocardiogram is taken merely for a checkup in the ordinary course or routine examination of the patient, it is not sent for. However, if it is taken by reason of a suspected illness or symptoms of an illness, the company requests a statement from the doctor who makes the electrocardiogram and requests to see the same. He admitted that the electrocardiogram referred to in the 1952 application as having been taken by Dr. Weiss was not requested nor was Dr. Weiss’ medical report ever sought.
*1029 On rebuttal, the plaintiff testified that none of the three doctors who had treated her husband, the insured, ever told her that he had a heart condition and that during the period testified to by them, beginning December 30, 1950 when Dr. Abelson was first called to see him, he went regularly to work, except for the time that he was hospitalized in Polyclinic Hospital for a checkup.
Another rebuttal witness was Dr. Weiss who testified that the insured had been a patient of his father since 1931; that in May, 1952 he came in and said that he had some difficulty, shortness of breath, especially after eating and felt a little tired. He was taken to Polyclinic Hospital for examination where Dr. Weiss and his father checked the insured’s cardiovascular system. Electrocardiograms and chest X rays were taken and blood work done on him, but no evidence of cardiac involvement was found.
Dr. Goldenberg, another rebuttal witness, stated that he was associated with the Polyclinic Hospital at the time that this checkup was made in 1952 and that he was consulted with respect to the electrocardiograms taken thereat. He testified that the electrocardiogram that was taken on April 25, 1952 showed slight changes and that these changes suggested myocardial disease. Because such changes may be transient, a followup was asked and another electrocardiogram taken on April 28 which appeared perfectly normal. As a result it was his opinion that there was then no evidence of a heart condition.
Upon the foregoing facts, it is the contention of the defendant, that it is entitled to judgment dismissing the complaint notwithstanding the failure of the jury to reach a verdict. There can be no doubt that this court has the power to direct judgment in this posture of the case. (Strasberg v. Equitable Life Assur. Soc., 281 App. Div. 9.) The question is whether this is the appropriate case in which such a judgment may be granted.
Section 457-a of the Civil Practice Act provides in its first paragraph that ‘ ‘ The court may direct a verdict when it would be required to set aside a contrary verdict for legal insufficiency of evidence.” In passing upon a motion for a directed verdict,
‘‘ the court cannot properly undertake to weigh the evidence. Its duty is to take that view of the evidence most favorable to the nonmoving party, and from the evidence and the inferences reasonably to be drawn therefrom, determine whether or not, under the law, a verdict might be found for the moving party.” (Wearever Upholstery & Furniture Corp. v. Home Ins. Co., 286 App. Div. 93, 95.) The test is whether the trial court could *1030 find ‘ ‘ that by no rational process could the trier of the facts base a finding in favor of the [party moved against] upon the evidence * * * presented.” (Blum v. Fresh Grown Preserve Corp., 292 N. Y. 241, 245.) In other words, the court is justified in directing a verdict in such a case “ not because it would have authority to set aside an opposite one, but because there was an actual defect of proof, and, hence, as a matter of law, the party was not entitled to recover.” (McDonald v. Metropolitan St. Ry. Co., 167 N. Y. 66, 70.)
The defendant contends that since neither the plaintiff nor her witnesses denied the treatment that the insured had received from Doctors Abelson, Candel and Davis, as testified to by them, nor the testimony of the defendant’s associate medical director that it would have declined the application under its rules and practices had the facts concerning such treatment been disclosed in the application for the two policies in suit, it is entitled to the direction of a verdict in its favor. The plaintiff, on the other hand, urges that since at the time of the application and issuance of the policies in suit, the defendant had in its possession the 1952 application for the policy issued that year by it, wherein the insured disclosed that he had had. an electrocardiogram taken by Dr. Weiss in 1952, only the jury may constitutionally pass upon the conflicting evidence, as well as the credibility of witnesses. However, the question here is not weight of evidence but ‘ ‘ whether the jury by any rational process could base a finding in favor of the plaintiff upon the evidence presented.” (Flanigan v. Cohu, 2 A D 2d 461, 465.) (See, also, Hey v. Huss, 7 Misc 2d 119.)
Assuming that the defendant must be charged with knowledge of the facts disclosed by the 1952 application (Lanigan v. Prudential Ins. Co., 63 Hun 408; Kelly v. Metropolitan Life Ins. Co., 15 App. Div. 220; Atlas v. Metropolitan Life Ins. Co., 181 N. Y. S. 363; see, however, United States v. Kiefer, 228 F. 2d 448, cert, denied 350 U. S. 933; United States v. Nero, N. Y. L. J., Sept. 13,1957, p. 1, col. 1 [C. C. A. 2d]), that would have alerted it solely to the fact that the insured had had a checkup by Dr. Weiss within six months prior to the 1952 application in connection with which an electrocardiogram had been taken with good results and no complaints. Possession of that information, coupled with the rebuttal testimony of Doctors Weiss and Goldenberg that the electrocardiogram taken in connection with the 1952 checkup disclosed no cardiac condition, would preclude a direction of a verdict were only the findings and treatment of Doctors Abelson and Candel between December 20, 1950 and April 15,1951 presented by this record.
*1031 Unquestionably, the failure by the assured to disclose the taking of the cardiogram and the treatment by Dr. Davis constituted misrepresentations. However, not every misrepresentation permits an insurance company to' avoid payment under a policy issued by it for subdivision 2 of section 149 of the Insurance Law provides “No misrepresentation shall void any contract of insurance or defeat recovery thereunder unless such misrepresentation was material. No misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such contract.”
Subdivision 4 of section 149 of the Insurance Law, so far as is here material, provides that “A misrepresentation that an applicant for life * * * insurance has not had previous medical treatment, consultation or observation * * * shall be deemed, for the purpose of determining its materiality, a misrepresentation that the applicant has not had the disease, ailment or other medical impairment for which such treatment or care was given or which was discovered by any licensed medical practitioner as a result of such consultation or observation.”
What then did Dr. Davis discover? He says that he examined the insured, took a cardiogram and discovered that the insured was suffering from auricular fibrillation, left ventricular strain and hypertrophy and coronary insufficiency. Dr. Davis is a general practitioner and the plaintiff contends that his diagnosis was incorrect and that the insured never had any of the conditions which Dr. Davis claims to have discovered.
Does the Insurance Law, when it speaks of a condition “ which was discovered by any licensed medical practitioner ” mean a condition which actually existed and was discovered by any licensed medical practitioner or does it mean an alleged discovery of a condition by any licensed medical practitioner, irrespective of whether in fact the applicant for insurance ever had the condition? Suppose, for the sake of argument, Dr. Davis’ alleged discovery was an improper and incorrect diagnosis ? Would it then mean that an insurance company could avoid a contract entered into by it under subdivision 4 even though the condition ‘ ‘ discovered ’ ’ by the medical practitioner did not in fact exist?
It seems to me that when the section speaks of a discovery of a condition it must mean of an actual existing condition. To discover something which does not in fact exist is not a discovery at all but an improper finding or diagnosis. In view of the testimony of the doctors called by the plaintiff, both of *1032 whom were specialists, and both of whom contradicted the findings of Doctors Abelson and Candel, and in view of the fact that the insured did not die of a heart condition but of a coronary occlusion due to an operation for carcinoma of the cecum, the jury was not bound conclusively to accept the testimony of Dr. Davis even if it be assumed that upon this record it is wholly uncontradicted. He was called as an expert in the art of medicine and as such the accuracy of his findings and diagnosis were subject matters for determination by the jury. (Commercial Cas. Ins. Co. v. Roman, 269 N. Y. 451, 456; Matter of City of New York [A. & W. Realty Corp.], 1 N Y 2d 428.)
Since under the record in this case a jury could determine that Dr. Davis’ diagnosis was erroneous and that a heart condition could not have been discovered by him because it did not in fact exist, the concealment by the assured of his treatment by Dr. Davis and the taking of a cardiogram, while unquestionably a misrepresentation, may not be held, as a matter of law, to be a material misrepresentation; that question is one for a trier of the facts to pass upon.
We are not here concerned with whether or not a finding by a jury in favor of the plaintiff might be set aside as contrary to the weight of the evidence but merely as to whether or not there is any issue of fact for submission to a jury. I believe that there is.
Tinder the circumstances, the motions of the defendant made at the end of the entire case, and renewed when the jury was unable to agree, for a directed verdict in its favor is denied with an exception and the case is set down for retrial in Trial Term, Part I, of this court for the 28th day of October, 1957.